---

# In the United States Court of Appeals
# For the Eighth Circuit

MORGAN-LARSON, LLC; JOHNSON AUTO ELECTRIC, INC.;
SPEED STOP 32, INC.; and YOCUM OIL COMPANY, INC.

Plaintiffs-Appellants,

v.

FERRELLGAS PARTNERS, L.P., A LIMITED PARTNERSHIP; FERRELLGAS, L.P., A
LIMITED PARTNERSHIP, DOING BUSINESS AS BLUE RHINO; AMERIGAS PARTNERS,
LP, A LIMITED PARTNERSHIP; UGI CORPORATION; AMERIGAS PROPANE, INC.,
DOING BUSINESS AS AMERIGAS CYLINDER EXCHANGE; and AMERIGAS PROPANE,
L.P.

Defendants-Appellees.

*Appeal from a Decision and Judgment of the United States District Court
for the Western District of Missouri, No. 4:14-MD-2567-GAF
Honorable Gary F. Fenner*

---

## PLAINTIFFS-APPELLANTS' SUPPLEMENTAL BRIEF

---

H. Laddie Montague, Jr.
Eric L. Cramer
Martin I. Twersky
Jennifer MacNaughton
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000 Telephone
(215) 875-4613 Facsimile

*Interim Co-Lead Counsel for the
Proposed Direct Purchaser Class*

Kit A. Pierson
Emmy L. Levens
Daniel Silverman
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave., N.W., Suite 500
Washington, D.C. 20005
(202) 408-4600 Telephone
(202) 408-4699 Facsimile

*Interim Co-Lead Counsel for the
Proposed Direct Purchaser Class*

Steve Susman
Vineet Bhatia
Stephen Morrissey
Lindsay Calkins
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 653-9366 Telephone
(713) 654-6666 Facsimile

*Interim Co-Lead Counsel for the
Proposed Direct Purchaser Class*

Richard F. Lombardo
SHAFFER LOMBARDO SHURIN,
P.C.
2001 Wyandotte
Kansas City, MO 64108
(816) 931-0500 Telephone

*Interim Liaison Counsel for the
Proposed Direct Purchaser Class*

# TABLE OF CONTENTS

I.  Introduction .................................................................................................1

II.  Case Synopsis and Procedural History. ..........................................................4

III.  Argument ....................................................................................................7

    A.  Unambiguous Supreme Court Precedent Renders Plaintiffs' Claims Timely. ....................................................................................7

    B.  *Klehr*'s Language Rests on Established Supreme Court Precedent. ...........................................................................................10

    C.  This Court's Precedent Correctly Holds That Sales Made Pursuant to a Continuing Price-Fixing Conspiracy Re-start the Limitations Period. ..............................................................................13

        1.  *Wholesale Grocery* Correctly Applied *Klehr* and Should be Binding Here. ................................................................14

        2.  This Court's Other Relevant Precedent Are Consistent with *Klehr* and *Wholesale Grocery*. .........................................17

    D.  Defendants Actively Conspired During the Limitations Period Establishing a Continuing Violation. .................................................20

IV.  Conclusion ...............................................................................................24

Appellate Case: 15-2789     Page: 3     Date Filed: 02/08/2017 Entry ID: 4499534

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................10

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
  203 F.3d 1028 (8th Cir. 2000) ....................................................22

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ....................................................15

*In re Cotton Yarn Antitrust Litig.*,
  505 F.3d 274 (4th Cir. 2007) ......................................................12

*Edward Katzinger Co. v. Chi. Metallic Mfg. Co.*,
  329 U.S. 394 (1947) ...................................................................18

*F.T.C. v. Elders Grain, Inc.*,
  868 F.2d 901 (7th Cir. 1989) (Posner, J.) ..................................22

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ...................................................................10

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  No. 13-2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014) ...............22

*Jessie v. Potter*,
  516 F.3d 709 (8th Cir. 2008) ........................................................7

*Joyce v. Armstrong Teasdale*,
  LLP, 635 F.3d 364 (8th Cir. 2011) ...............................................7

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)...........................................................*passim*

*McDonough v. Anoka Cty.*,
  799 F.3d 931 (8th Cir. 2015) ......................................................12

- i -

*Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ................................................................2, 17, 22

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) ..................................................................13

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ..................................................................12

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993) ...................................................................22

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    834 F.3d 943 (8th Cir.2016) ..................................................................7, 12

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940).................................................................................16

*In re Urethane Antitrust Litig.*,
    913 F. Supp. 2d 1145 (D. Kan. 2012)......................................................16

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) ..........................................................*passim*

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).................................................................................20

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    722 F. Supp. 2d 1079 (D. Minn. 2010).................................................14, 16

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) ............................................................*passim*

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ...................................................................21

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971).............................................................................10, 11

## STATUTES

15 U.S.C. § 15b.............................................................................................11

15 U.S.C. § 16(i) ............................................................................................8

Appellate Case: 15-2789    Page: 5    Date Filed: 02/08/2017 Entry ID: 4499534

## OTHER AUTHORITIES

Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Paralellism and Refusals to Deal*, 75 Harv. L. Rev. 655 (1962)..................................................................................22

George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44 (1964)....................22

Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. (2008)...............................................................................15

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2016)....................*passim*

Richard A. Posner, *Economic Analysis of Law* (3d ed. 1986)................................22

Appellate Case: 15-2789     Page: 6     Date Filed: 02/08/2017 Entry ID: 4499534

## I. Introduction

The Supreme Court has unequivocally stated: in the case of a continuing price-fixing conspiracy, "'each overt act that is part of the violation and that injures the plaintiff,' e.g., *each sale to the plaintiff*, 'starts the statutory period running again.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citations omitted) (emphasis added). Pursuant to this principle, known as the "continuing violation doctrine," plaintiffs in a price-fixing conspiracy need not show anything beyond the fact that they paid an unlawful overcharge during the limitations period. *Klehr*'s language rests on a foundation of forty years of Supreme Court precedent and, as this Circuit recently recognized, establishes a controlling legal principle in the context of horizontal conspiracies. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014). Therefore, Plaintiffs-Appellants should be permitted to recover for damages resulting from their purchases of price-fixed propane tanks during the limitations period regardless of the fact that the alleged conspiracy began earlier.

Indeed, the instant appeal presents a straightforward application of the continuing violation doctrine: Plaintiffs allege that Defendants, the two largest manufacturers of filled propane tanks in America, conspired to reduce the fill levels in their tanks without reducing prices (the equivalent of a 13% price increase) in 2008. By maintaining that price while reducing the volume being sold,

- 1 -

the Defendants acted in concert to achieve a result that is fundamentally identical to the joint imposition of a fixed, higher price. For the following six years, Defendants continued to consciously abide by their unlawful agreement, maintaining fill levels and selling propane tanks at supracompetitive prices. Pursuant to *Klehr* and *Wholesale Grocery*, and consistent with the law of every other circuit that has considered this issue, Plaintiffs can recover for damages sustained within the limitations period.

*Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004), and *Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004) – the two cases relied upon by the district court and Defendants – are entirely consistent with applying the continuing violation doctrine here. Those cases sought to apply the doctrine to antitrust contexts beyond a price-fixing conspiracy, such as a tying agreement or merger challenge. Neither case sought to limit *Klehr*'s holding or announce a new rule for horizontal conspiracies. To the contrary, *Midwestern Machinery* expressly distinguished price-fixing cases in providing its analysis. And, the *Varner* Opinion did not even cite *Klehr*.

Professor Areeda's definitive treatise, Antitrust Law, similarly analyzes the continuing violation doctrine differently in different antitrust contexts, explaining that the existence of a continuing violation "depends heavily on the particular facts as well as the type of violation." Phillip E. Areeda & Herbert Hovenkamp,

Appellate Case: 15-2789    Page: 8    Date Filed: 02/08/2017 Entry ID: 4499534

*Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320(a)(1) (4th Ed. 2016) (hereinafter "Areeda").[1]  Areeda proceeds to analyze the applicability of the continuing violation doctrine depending on the underlying antitrust violation.  *See id.* ¶ 320(c)(2)(addressing cartels); ¶ 320(c)(3)(vertical agreements); ¶ 320(c)(4)(monopolies); and ¶ 320(c)(5)(mergers).  Accordingly, *Varner* and *Midwestern Machinery* in no way conflict with the principle – outlined in *Klehr* and adopted in *Wholesale Grocery* – that sales at supracompetitive prices establish continuing violations *in the context of horizontal conspiracies*.  Pursuant to this principle, Plaintiffs' claims are timely and the district court's opinion holding otherwise should be reversed.

But critically, Plaintiffs allege more than just continued sales at supracompetitive prices – though that alone should be sufficient.  Plaintiffs also allege that Defendants continued to communicate during the limitations period to reaffirm their mutual commitment to the conspiracy and further allocate customers and territories.  These allegations of continued conspiratorial conduct are independently sufficient to establish a continuing violation and re-start the limitations period, and therefore these allegations present an alternative basis upon which to reverse the district court's opinion.  *See* Areeda ¶ 320(c)(2) ("each new

---

[1] For the Court's convenience, a copy of the relevant section in Areeda is appended to this brief as Appellants' Supplemental Addendum.

- 3 -

meeting serves to keep the cause of action alive for those injuries that occur within four years prior to the filing of an antitrust complaint").

## II.   Case Synopsis and Procedural History.

The relevant facts and procedural history are recounted in Plaintiffs-Appellants' Opening Brief.  For the Court's convenience, a brief synopsis of the case is provided here, beginning with a chronology of relevant events:

| Date | Event |
|------|-------|
| June 2008 | Conspiracy formed: Defendants reduce fill levels for their propane tanks while maintaining prices.[2] |
| August 2009 | Conspiracy initially disclosed; a civil complaint is filed seeking Antitrust damages, which is later settled on behalf of indirect purchasers only.[3] |
| 2010 | Plaintiffs allege Defendants continued to communicate to maintain their conspiracy and potentially enlarge conspiracy's scope.[4] |
| March 27, 2014 | The Federal Trade Commission files a complaint challenging Defendants' conspiracy.[5] |
| Spring and Summer 2014 | Private lawsuits filed on behalf of direct purchasers seeking damages resulting from Defendants' conspiracy. |
| January 29, 2015 | Direct Purchaser Plaintiffs file Consolidated Amended Complaint.[6] |

[2] Consolidated Am. Compl. ("CAC") ¶¶ 8-9, 49-50, 57-66 (JA0133, JA0142-46).

[3] *Id.* ¶¶ 100-109 (JA0152-54).

[4] *Id.* ¶¶ 13; 92 (JA0134; JA0151).

[5] *Id.* ¶¶ 94-99 (JA0151-52).

Appellate Case: 15-2789     Page: 10     Date Filed: 02/08/2017 Entry ID: 4499534

Defendants' conspiracy arose in the wake of significant cost pressure. CAC ¶¶ 49-51 (JA0142-43). To forestall falling profits, Defendants considered decreasing fill levels unilaterally, but knew that they could not successfully do so alone. *Id.* ¶ 51 (JA0143). In May, 2008, Defendants began regularly communicating about their joint desire to reduce fill levels. *Id.* ¶¶ 58-68 (JA0144-46). By June, 2008, Defendants had agreed to reduce fill levels from 17 pounds to 15 pounds while maintaining prices at their pre-reduction levels – the equivalent of a 13% price increase. *Id.* ¶¶ 7; 60 (JA0133; JA0145). Defendants made this reduction without having to make any structural or technological changes to their manufacturing process – they simply altered the amount of propane filled in each tank. *See*, *e.g.*, *id.* ¶ 64 (JA0146) (alleging defendants changed fill-levels in less than a month).

In 2009, Defendants' conspiracy was revealed with the filing of a civil class action by indirect purchasers. *Id.* ¶¶ 100-109 (JA0152-0154).[7] Following this filing, Plaintiffs had no reason to believe Defendants continued their conspiracy – indeed, it is entirely reasonable to assume that conspirators would cease their unlawful behavior after they are caught.

---

[6] JA0131.

[7] The original suit defined the class ambiguously but the case later settled on behalf of indirect purchasers only. *Id.* ¶¶ 100-109 (JA0152-154).

Appellate Case: 15-2789    Page: 11    Date Filed: 02/08/2017 Entry ID: 4499534

Plaintiffs allege that Defendants *continued* to conspire even after the filing of the indirect purchasers' lawsuit. Specifically, Plaintiffs allege that, through at least the end of 2010 and possibly later, Defendants regularly communicated to assure compliance with their ongoing conspiracy and discuss pricing to their customers. *Id.* ¶¶ 13, 60, 92 (JA0134; JA0145; JA0151). For example, in 2010, AmeriGas executive Ken Janish assured his colleagues of that its competitor, Defendant Blue Rhino would not compete on price, stating, "I talked to Blue Rhino, and that's not going to happen." *Id.* ¶ 13 (JA0134). As a direct and proximate result of Defendants' conspiracy, persons and entities that purchased filled propane tanks from defendants between 2008 and 2015 paid more than they otherwise would have. *Id.* ¶ 111 (JA0155).

On March 27, 2014, the Federal Trade Commission issued its complaint against Defendants.[8] *Id.* ¶ 94 (JA0151). Shortly thereafter Plaintiffs filed the instant civil suit. On October 31, 2014, Defendants entered into two consent agreements in which they agreed to cease and desist and change various business practices in exchange for the FTC dismissing its complaint. *Id.* ¶¶ 94-99 (JA0151-52).

On July 2, 2015, the district court issued an order granting Defendants' motion to dismiss Plaintiffs' claims as untimely. (JA0333). Plaintiffs appealed

---

[8] *Id.* ¶¶ 94-99 (JA0151-52).

Appellate Case: 15-2789    Page: 12    Date Filed: 02/08/2017 Entry ID: 4499534

and, on August 25, 2016, this Court affirmed. *In re Pre-Filled Propane Tank Antitrust Litig.*, 834 F.3d 943 (8th Cir.2016). Judge Benton dissented from that decision, opining that pursuant to *Klehr* and *Wholesale Grocery*, Plaintiffs' claims for damages sustained within the limitations period were timely. *Id.* at 950-952. On December 29, 2016, this Court vacated its prior opinion and judgment and granted Plaintiffs' petition for rehearing en banc.

## III.  Argument

This Court reviews de novo the district court's grant of a motion to dismiss. *Joyce v. Armstrong Teasdale*, LLP, 635 F.3d 364, 367 (8th Cir. 2011). "As a general rule, 'the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense.'" *Joyce*, 635 F.3d at 367 (quoting *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008)).

### A.  Unambiguous Supreme Court Precedent Renders Plaintiffs' Claims Timely.

In *Klehr*, a civil RICO case applying the antitrust limitations statute, the Supreme Court defined the contours of the continuing violation doctrine in a price-fixing conspiracy as follows:

> Antitrust law provides that, in the case of a "continuing violation," say, a price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., *each sale to the plaintiff, "starts the statutory period running again, regardless of the*

- 7 -

*plaintiff's knowledge of the alleged illegality at much earlier times."* 2
Areeda ¶ 338b, at 145 (footnote omitted) . . . . But the commission of
a separate new overt act generally does not permit the plaintiff to
recover for the injury caused by old overt acts outside the limitations
period.[9]

*Klehr*, 521 U.S. at 189 (emphasis added); *see also* Areeda ¶ 320(c)(2)("some

courts conclude that each sale itself is an independent act sufficient to toll the

statute.").

The Supreme Court provided this explanation as a foil to the Third Circuit's

"last predicate act" rule – which would have allowed RICO plaintiffs to claim

damages for an entire pattern of unlawful activity so long as the defendant

committed one act in that pattern during the limitations period. *Klehr*, 521 U.S. at

189-190. In contrasting the two approaches, the Court emphasized that, unlike the

continuing violation doctrine, the last predicate act rule went "too far" in extending

liability. The Court's framing of the continuing violation doctrine was essential to

its holding: in rejecting the "last predicate act" rule, the Court held that it was not

just any act in furtherance of the unlawful scheme, but an *injury-causing act* (in

price-fixing cases, "each sale to the plaintiff"), that restarts the limitations period.

*Id.* at 189; *see also* Areeda ¶ 320(c)(7). There can be no doubt what the Supreme

---

[9] Plaintiffs are claiming damages only for the four years prior to the FTC's
filing of its complaint. As the district court correctly recognized, the filing of an
administrative complaint tolls the statute of limitations for private litigants. 15
U.S.C. § 16(i); *see also* District Court Op. at 7 (JA0339).

Court meant when it recognized that "sales to other farmers" would constitute a "new predicate act," but under the facts of that case, that did not help the Klehrs.[10]

Areeda provides additional guidance for applying *Klehr*'s language in price-fixing conspiracies. Areeda explains that in determining, "[w]hether continuing high prices alone should be sufficient to toll the statute of limitations," courts must examine the underlying facts to determine whether "continuing higher prices were a consequence of the price-fixing agreement." *Id.* ¶ 320(c)(2). In analyzing the facts, Areeda notes that, "if a cartel in a competitively structured market caused overnight increases in short-term prices, one would expect prices to move back to the [pre-]cartel [sic] level very quickly after cartel enforcement ceased." *Id.* In such circumstances, "it would [] be reasonable to infer continuing acts from continuing higher prices." *Id.*

That is exactly what is alleged here: nothing prohibits Defendants from either (a) returning fill-levels to their pre-conspiracy levels or (b) reducing prices to reflect the amount of propane provided. However, even after the 2009 lawsuit, Defendants did neither. CAC ¶ 111 (JA0155). Accordingly, Areeda provides that

---

[10] Here, the lower court adopted a sweeping rule that would time-bar even claims by entities that made no purchases until more than four years after the conspiracy was initiated and thus could not even have filed suit within that time period. Despite this, the lower court's rationale would allow the Defendants to continue to impose supracompetitive prices in perpetuity on those entities as well as all other purchasers.

Appellate Case: 15-2789    Page: 15    Date Filed: 02/08/2017 Entry ID: 4499534

it is reasonable to infer a continuing violation based on sales at supracompetitive prices alone. Areeda ¶ 320(c)(2). And importantly, Plaintiffs are entitled to all reasonable inferences in their favor at the motion to dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### B. *Klehr*'s Language Rests on Established Supreme Court Precedent.

The Court in *Klehr* did not invent the continuing violations doctrine; rather, the Court simply described the doctrine as it already existed, and still exists, based on Supreme Court precedent that is now over forty years old. The Supreme Court first referenced the doctrine in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), a Section 2 case involving a challenge to a lease-only policy that had been in place for more than forty years. In rejecting the defendant's argument that the plaintiff's claims were time-barred, the Court noted that allegations of "a continuing violation of the Sherman Act" that inflicts "continuing and *accumulating harm*," can warrant plaintiffs' recovery regardless of when the violation first began. 392 U.S. at 502 n.15 (emphasis added).

The Supreme Court expanded on the scope of the continuing violation doctrine in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), where it confronted the issue of "whether Zenith can recover in its 1963 suit for damages suffered after June 1, 1959, as the consequence of pre-1954 conspiratorial

- 10 -

conduct." *Id.* at 338. Zenith, the defendant in a patent lawsuit, had counterclaimed for antitrust violations based on Hazeltine's participation in patent pools in several countries, which Zenith alleged had impeded its access to those markets. The Court began by summarizing the basic standards governing accrual of antitrust claim accrues under 15 U.S.C. § 15b:

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. … In the context of a continuing conspiracy . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

*Zenith*, 401 U.S. at 338 (citations omitted) (emphasis added). In finding Zenith's claim timely, the Supreme Court based the start of the statutory period on the date when the plaintiff was *injured*, not the date when the challenged conduct actually began, and did not survey the record in search of any additional overt acts within the four-year limitations period.

The language in *Klehr*, *Hanover Shoe*, and *Zenith* established a clear principle that controls a price-fixing conspiracy case such as this. In such cases, plaintiffs may recover for damages resulting from overcharges on purchases made no more than four years before the complaint was filed, but may not, absent some other basis for tolling the statute of limitations, recover for earlier damages dating back to the conspiracy's inception.

- 11 -

Defendants urge this Court to disregard *Klehr*'s plain language as irrelevant dicta. But *Klehr*'s language merely reiterated *Zenith*'s holding which restarted the limitations period every time plaintiffs were injured. Moreover, as Judge Benton recognized in his dissent, "federal courts 'are not free to limit Supreme Court opinions to the facts of each case'" and "'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings ….'" 834 F.3d at 950 (quoting *McDonough v. Anoka Cty.*, 799 F.3d 931, 942 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 2388 (2016)).

As reflected above, the continuing violation doctrine has been refined by the Supreme Court in three separate opinions all supporting the same conclusion: that in a price-fixing conspiracy, each overcharge restarts the statutory period. Notably, every Circuit Court – including this one – that has had occasion to address the issue have agreed that *Klehr*'s language is binding in conspiracy cases. *See* 834 F.3d at 950-951 (Benton, J., dissenting). *See also*, *e.g.*, *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("[T]he Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 291 (4th Cir. 2007) (holding horizontal price-fixing claims were not barred by statute of limitations "so long as the plaintiffs made a purchase

Appellate Case: 15-2789     Page: 18     Date Filed: 02/08/2017 Entry ID: 4499534

from the Defendants" within the limitations period); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended by* 211 F.3d 1224 (11th Cir. 2000) ("[W]hen sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues. As a cause of action accrues with each sale, the statute of limitations begins to run anew.") (citation omitted); Opening Br. at 15-25 (citing cases).

Accordingly, this Court should apply the explicit language in *Klehr* and reverse the district court's decision. Any contrary result would incentivize conspirators to, if caught, settle for any past overcharges but continue selling at fixed prices without fear of reprisal. Such a result is neither consistent with existing precedent nor acceptable as a matter of policy.

**C.    This Court's Precedent Correctly Holds That Sales Made Pursuant to a Continuing Price-Fixing Conspiracy Re-start the Limitations Period.**

This Court has already had occasion to opine on the applicability of the continuing violation doctrine to price-fixing conspiracies and held, correctly and explicitly, that *Klehr* controls. *Wholesale Grocery*, 752 F.3d at 736. Defendants have not and cannot provide any reasoned basis for departing from this recent authority and, accordingly, this Court should reaffirm its prior holding in

- 13 -

*Wholesale Grocery* that, consistent with *Klehr*, sales made pursuant to a horizontal conspiracy are sufficient to restart the limitations period.

      **1.**    ***Wholesale Grocery* Correctly Applied *Klehr* and Should be Binding Here.**

In *Wholesale Grocery*, this Court examined the applicability of the continuing violation doctrine to a conspiracy to allocate markets. In that case, two rival grocery wholesalers allegedly used a written asset exchange agreement as a subterfuge to allocate customers and territories in violation of Section 1 of the Sherman Act. Plaintiffs did not file suit until more than four years after the defendants' agreement was reached and the *Wholesale Grocery* defendants' argued plaintiffs' claims were untimely. *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1087 (D. Minn. 2010). The defendants further maintained that the plaintiffs could not recover under the continuing violation doctrine because the wholesalers' sales at supracompetitive prices did not qualify as "overt acts" sufficient to restart the statute of limitations. *Id.* The district court squarely rejected that position, holding that the supracompetitive prices charged within the limitation period were "new and independent acts that inflicted new and accumulating injury rather than unabated, inertial consequences or reaffirmations of a previous conspiracy." *Id.* at 1089.

This Court affirmed, explaining that "[u]nder *Klehr*, a monopolist commits an overt act each time he uses unlawfully acquired market power to charge an

Appellate Case: 15-2789    Page: 20    Date Filed: 02/08/2017 Entry ID: 4499534

elevated price." *Wholesale Grocery,* 752 F.3d at 736. Significantly, in holding that "[t]he timeliness question in this case is controlled by *Klehr,*" the Eighth Circuit explicitly cited *Klehr's* language equating overt acts with each new sale, but italicized for emphasis the example provided by the Supreme Court: "e.g., each sale to the plaintiff[.]" *Id.* (quoting *Klehr*, 521 U.S. at 189). This Court reached an identical conclusion in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000), where it explained that "each new sale by a Sherman Act price fixing defendant" constitutes a "separate new overt act" and continuing violation).[11]

Although Defendants have previously attempted to distinguish *Wholesale Grocery* by arguing that the true anticompetitive nature of the defendants' agreement in that case remained hidden for several years and that prices did not increase until later, that claim contradicts the record. In fact, the district court in *Wholesale Grocery* explicitly *rejected* that factual argument when the plaintiffs raised it when arguing for tolling based on fraudulent concealment. The court found that although the agreement itself was kept secret, the anti-competitive

---

[11] Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 314 (2008) (summarizing the law of continuing violations and recognizing that "each sale made to a consumer pursuant to a price-fixing or market-allocation conspiracy will give rise to a separate claim with its own limitations period, even if these sales were the completely predictable result of a notorious agreement to manipulate the market perfected outside of the limitations period"). *See also* Opening Br. at 15-25.

- 15 -

effects of it (*i.e.*, higher prices) were not, and therefore the plaintiffs were on inquiry notice of their claims. *Wholesale Grocery*, 722 F. Supp. 2d at 1085.[12] Nonetheless, the district court found that the plaintiffs had pled a continuing violation because "the alleged charging of supra-competitive prices amounts to more than the mere reaffirmation of the prior market/customer allocation." *Id.* at 1087. This Court explicitly upheld that ruling, stating "[t]he timeliness question in this case is controlled by *Klehr*," 752 F.3d at 736, and quoting and emphasizing *Klehr*'s statement that "*each sale to the plaintiff*" – regardless of the timing of that sale in connection with other anticompetitive conduct – "starts the statutory period running again." *Id.* (quoting *Klehr*, 521 U.S. at 189) (emphasis as supplied).

Further, it is well settled that conspiracies to "stabilize" or "maintain" prices are just as much per se violations of the Sherman Act as agreements to increase prices.[13] Accordingly, in a case involving an unlawful horizontal conspiracy, there is no principled basis for finding that a further price *increase* should be treated any differently than a repeat of the same supracompetitive overcharge.

---

[12] "The [Asset Exchange Agreement] was executed, Defendants exited each others' markets and, according to the allegations of the Complaint, Plaintiffs then began almost immediately experiencing higher prices"; *see also id.* at 1082-83 (describing terms of Agreement and defendants' exit from each other's markets in 2003 and spring 2004).

[13] *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1156 (D. Kan. 2012).

Appellate Case: 15-2789     Page: 22     Date Filed: 02/08/2017 Entry ID: 4499534

Defendants' and the district court's attempts to distinguish *Wholesale Grocery* fall short for the very simple reason that *Wholesale Grocery* binds this case. Pursuant to *Klehr* and *Wholesale Grocery*, this case presents a quintessential continuing violation.

### 2. This Court's Other Relevant Precedent Are Consistent with *Klehr* and *Wholesale Grocery*.

Nothing in *Wholesale Grocery* is inconsistent with this Court's other continuing violations precedent including *Midwestern Machinery* and *Varner*. Indeed, in those cases – where the Court was asked to apply the continuing violation doctrine to antitrust claims outside the cartel context – this Court was careful to respect the fundamental differences between horizontal conspiracies and other antitrust claims.

This Court's continuing violation jurisprudence honors these differences by expressly distinguishing price-fixing cases from other types of antitrust violations. As explained in *Midwestern Machinery*, "to apply the continuing violation theory to non-conspiratorial conduct," i.e., in scenarios *other than the "typical" price-fixing case*, "new overt acts must be more than the unabated inertial consequences of the initial violation." 392 F.3d at 270 (emphasis added). Nothing in this statement purports to announce a rule for price-fixing conspiracies. To the contrary, the language expressly disavows any modification to the continuing

- 17 -

violation doctrine as applied in price-fixing conspiracies. That continued sales pursuant to an illegal agreement among horizontal competitors qualify as a continuing violation, however, has been clearly established in *Klehr*, W*holesale Grocery*, and every other case to have addressed the issue.

*Varner*'s holding is similarly limited to the particular facts of that case. In *Varner*, the plaintiffs, former poultry farmers, alleged that their contract with a poultry buyer (Peterson Farms) was an illegal tying agreement. 371 F.3d at 1019-20. The contract was agreed outside of the limitations period, but the plaintiffs claimed their actions pursuant to the contract (which, among other things, required them to purchase supplies from Peterson) constituted continuing violations. The Court held that "[p]erformance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." *Id.* at 1020. However, a legally binding contract, the terms of which were fixed years earlier and which is enforceable in a court of law, is very different from an unlawful price-fixing conspiracy that relies on the co-conspirators' mutual reassurances and policing to ward off the ever-present temptation to cheat.[14]

Indeed, *Varner* contains no mention of allegations that defendants abused their market power, charged supracompetitive prices, or otherwise harmed

---

[14] *See Edward Katzinger Co. v. Chi. Metallic Mfg. Co.*, 329 U.S. 394, 399 (1947) ("price-fixing agreements such as those here involved are unenforceable because of violations of the Sherman Act").

Appellate Case: 15-2789    Page: 24    Date Filed: 02/08/2017 Entry ID: 4499534

competition.  Rather, the Court held plaintiffs had "failed to plead sufficient facts to support a cause of action for a tying-contract antitrust violation or establish an exception to toll the statutes of limitation."  *Id.*  With this statement the Court recognized plaintiffs had failed to allege a viable antitrust claim regardless of the timeliness of their allegations.[15]  Perhaps most important, however, *Varner* contains no citation to *Klehr* or any other reference to price-fixing cases.  Accordingly, there is no basis for reading *Varner* to limit *Klehr* or otherwise applying *Varner* to price-fixing conspiracies.  Notably, in analyzing *Midwestern Machinery* and *Varner*, Areeda specifically notes their applicability to merger and tying cases.  *See* Areeda ¶ 320(c)(3) and (5).  Areeda's discussion regarding the continuing violations in the cartel context contains no mention of these cases.  *Id.* ¶ 320(c)(2).

The policy justifications warranting application of the continuing violation doctrine differ depending on the context in which the doctrine is applied.  Areeda explains that:

> In the case of "public" acts challenged as antitrust violations, such as publicly announced joint ventures or

---

[15] The claimed injury in *Varner* did not fit neatly within the rubric of a typical tying claim, nor indeed, any other recognized cause of action.  The plaintiffs in *Varner* additionally raised claims of securities fraud, common-law fraud, violations of RICO, civil conspiracy, unjust enrichment, and violations under the Packers and Stockyard Act.  371 F.3d at 1015.

Appellate Case: 15-2789     Page: 25     Date Filed: 02/08/2017 Entry ID: 4499534

> mergers, dealer terminations, or exclusionary practices that are known by those at whom they are directed. Such practices are generally public, and injured parties are able to feel and perhaps to assess their injuries almost immediately. But assessing antitrust consequences is often difficult, and reasonable minds might differ on that question. In such cases it is especially important that antitrust challenges be timely made, thus minimizing the social costs of any antitrust violation but giving the parties repose for conduct that is lawful.

Areeda ¶ 320(a). Conversely, defendants have no legitimate interest in repose in the context of price-fixing conspiracies, as such conspiracies are *never* lawful.[16] This Court's precedent appropriately handles different antitrust violations differently when applying the continuing violation doctrine. Applying the precedent applicable to horizontal conspiracies *to a horizontal conspiracy case* in no way undermines the continued viability of other cases which apply in other contexts.

### D. Defendants Actively Conspired During the Limitations Period Establishing a Continuing Violation.

For the foregoing reasons, the Defendants' continuing sales at supracompetitive prices resulting from the conspiracy is, without more, sufficient to re-start the limitations period and permit recovery by purchasers injured by those overcharges. The allegations in this case, however, go considerably beyond

---

[16] A price-fixing cartel is "the supreme evil" prohibited by the antitrust laws. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

- 20 -

that. Plaintiffs' allegations of additional conspiratorial activities during the limitations period independently qualify as "overt acts" sufficient to constitute a continuing violation.

Specifically, Plaintiffs allege that, during the limitations period, Defendants continued to communicate to reinforce and maintain their price-fixing agreement and reduce the risk of either party "cheating" on that agreement.[17] These communications were not mere idle chatter; they were necessary to the conspiracy's continued success.[18] The familiar "prisoner's dilemma" game theory framework teaches that a conspiracy cannot continue merely on its own inertia. The cartel members know the rewards of "cheating" on a cartel agreement are great, and each will be quick to abandon the agreement if it suspects the other will succumb to that temptation. Thus, regular monitoring, mutual reassurances, and

_____

[17] *See* CAC ¶¶ 92-93 (JA0151) ("Through at least the end of 2010 . . . . Should cheating be suspected, Defendants communicated with each other to reassure each other of their compliance with the conspiracy."); CAC ¶¶ 12-13, 46-47, 58, 60 (JA0134, JA0142, JA0144-45); *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) (explaining that "continuing violations" are frequently found in price-fixing conspiracy cases because "each price increase requires further collusion between multiple parties to maintain the monopoly [level prices]").

[18] *See* CAC ¶¶ 12-13, 46-47, 58, 60, 92-93 (JA0134, JA0142, JA0144-45, JA0151).

- 21 -

the threat of retaliation are needed to sustain a price-fixing agreement.[19]  And as the Court explained in *Midwestern Machinery*, the fact that communications contribute to the success of a conspiracy renders them new "overt acts" for purposes of the continuing violation doctrine: "[t]he typical antitrust continuing violation occurs in a price-fixing conspiracy, actionable under § 1 of the Sherman Act, when conspirators continue to meet to fine-tune their cartel agreement.  These meetings are overt acts that begin a new statute of limitations because they serve to further the objectives of the conspiracy." 392 F.3d at 269 (internal citations omitted) (emphasis added).[20]

---

[19] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) (citing Richard A. Posner, *Economic Analysis of Law* 265–66 (3d ed. 1986) & Stigler, *infra*) ("Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great."); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1042 (8th Cir. 2000) (citing George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44, 46 (1964)); *id.* at 1038 n.9 ("*[W]ithout* an agreement among oligopolists, the pressure to cut prices is irresistible.") (citing Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655, 660 (1962)); *F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 905 (7th Cir. 1989) (Posner, J.) ("Colluders are tempted to cheat on their fellows when they can augment their profits by a single large sale (at a shade below the cartel price) that is unlikely to be detected.").

[20] *Compare Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664, 2014 WL 943224, at *6-7 (D. Minn. Mar. 11, 2014), *aff'd on other grounds*, 797 F.3d 538 (8th Cir. 2015) (holding that communications did not qualify as overt acts where unnecessary to "maintain[] the unlawful arrangements.")

Appellate Case: 15-2789     Page: 28     Date Filed: 02/08/2017 Entry ID: 4499534

Moreover, the specific collusive activities Plaintiffs allege go *beyond* the Defendants' earlier, continuing agreement to reduce propane tank fill levels: Plaintiffs allege that the Defendants also allocated markets and coordinated on pricing to specific customers.[21]  These communications are independently unlawful because these acts "stabilized" the price of propane tanks.  *See* Areeda ¶ 320c(2) ("[E]ach new meeting of the cartel is independently unlawful without regard to any meeting that may have occurred previously.").  Put another way, Defendants' conduct during the limitations period could establish an independent antitrust violation irrespective of the earlier conspiracy.  Plaintiffs' injuries resulting from this conduct – injuries that occurred during the limitations period – are thus timely.

In dismissing these allegations as "mere reaffirmations" of the fill-conspiracy, the district court essentially held that, as long as a price fixing cartel does not "change or modify" its agreement, its members can continue to enforce the cartel and to collect supracompetitive profits indefinitely.  District Court Op. at 13 (JA0345).  But Defendants' meetings to stabilize prices and further their conspiracy – the classic unlawful conduct the Sherman Act is meant to prevent – cannot be what this Court meant when it held that an overt act "must be a new and independent act that is not merely a reaffirmation of a previous act[.]" *Varner*, 371 F.3d at 1019.  Such a rule would permit the Defendants to continue to engage in

---

[21] *See* CAC ¶¶ 13, 92 (JA0134, JA0151).

Appellate Case: 15-2789     Page: 29     Date Filed: 02/08/2017 Entry ID: 4499534

*per se* illegal behavior in perpetuity without any concern they will have to compensate injured parties. This is not the law in this Circuit, nor should it be.

## IV.    Conclusion

For the reasons stated above and in the prior briefing to the Court, Plaintiffs-Appellants respectfully request that the Court the Court REVERSE the district court's order dismissing their claims and REMAND this matter for further proceedings.

Dated:  February 7, 2017

Respectfully Submitted,

*/s/ H. Laddie Montague, Jr.*
H. Laddie Montague, Jr.
Eric L. Cramer
Martin I. Twersky
Jennifer MacNaughton
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215.875.3000
Facsimile: 215.875.4613
hlmontague@bm.net
ecramer@bm.net
mtwersky@bm.net
jmacnaughton@bm.net

Kit A. Pierson
Emmy L. Levens
Daniel Silverman
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 20005

Telephone: 202.408.4600
Facsimile: 202.408.4699
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
dsilverman@cohenmilstein.com

Steve Susman
Vineet Bhatia
Stephen Morrissey
Lindsay Calkins
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713.653.9366
Facsimile: 713.654.6666
ssusman@susmangodfrey.com
vbhatia@susmangodfrey.com
smorrisey@susmangodfrey.com
lcalkins@susmangodfrey.com

*Counsel for Appellants and Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*

Richard F. Lombardo
SHAFFER LOMBARDO SHURIN, P.C.
2001 Wyandotte Street
Kansas City, MO 64108
Telephone: 816.931.0500
rlombardo@sls-law.com

*Counsel for Appellants and Interim Liaison Counsel for the Proposed Direct Purchaser Class*

Appellate Case: 15-2789   Page: 31   Date Filed: 02/08/2017 Entry ID: 4499534

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the volume limitation allowed under the Court's Order Regarding Supplemental Briefing, (Jan. 19, 2017) because:

   a. The petition contains 5,460 words; and

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   a. The brief has been prepared in a proportionally spaced typeface using Word version 14.0 (32-bit) of Microsoft Office Professional Plus 2010 in 14 point Times New Roman font.

*/s/ Richard F. Lombardo*
Richard F. Lombardo

*Counsel for Appellant and Interim Liaison Counsel for the Proposed Direct Purchaser Class*

Dated: February 7, 2017

Appellate Case: 15-2789    Page: 32    Date Filed: 02/08/2017 Entry ID: 4499534

**CERTIFICATE OF SERVICE**
**FOR DOCUMENTS FILED USING CM/ECF**

I hereby certify that on February 7, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Richard F. Lombardo*
Richard F. Lombardo

*Counsel for Appellants and Interim Liaison Counsel for the Proposed Direct Purchaser Class*

Appellate Case: 15-2789      Page: 33      Date Filed: 02/08/2017 Entry ID: 4499534