**In the United States Court of Appeals
For the Eighth Circuit**

IN RE PRE-FILLED PROPANE TANK ANTITRUST
LITIGATION

MORGAN-LARSON, LLC; JOHNSON AUTO ELECTRIC,
INC.; SPEED STOP 32, INC.; and YOCUM OIL
COMPANY, INC.

Plaintiffs-Appellants,

v.

FERRELLGAS PARTNERS, L.P., A LIMITED PARTNERSHIP; FERRELLGAS,
L.P., A LIMITED PARTNERSHIP, DOING BUSINESS AS BLUE RHINO;
AMERIGAS PARTNERS, L.P., A LIMITED PARTNERSHIP; UGI
CORPORATION; AMERIGAS PROPANE, INC., DOING BUSINESS AS
AMERIGAS CYLINDER EXCHANGE; and AMERIGAS PROPANE, L.P.

Defendants-Appellees.

*Appeal from a Decision and Judgment of the United States District
Court for the Western District of Missouri, No. 4:14-MD-2567-GAF
Honorable Gary A. Fenner*

**SUPPLEMENTAL BRIEF FOR DEFENDANTS-APPELLEES**

Daniel M. Wall
Niall E. Lynch
Jesse B. McKeithen
LATHAM & WATKINS LLP
505 Montgomery St., Suite 2000
San Francisco, California 94111
(415) 391-0600

*Attorneys for Defendants
Ferrellgas Partners, L.P. and
Ferrellgas, L.P.*

Jay N. Varon
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007
(202) 672-5380

*Attorney for Defendants AmeriGas
Partners, L.P., AmeriGas Propane,
Inc., AmeriGas Propane, L.P., and
UGI Corporation*

Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.,
Suite 1000
Washington, DC 20004
(202) 637-2200

*Attorney for Defendants Ferrellgas
Partners, L.P. and Ferrellgas, L.P.*

Craig S. O'Dear
Catesby A. Major
Tracy R. Hancock
BRYAN CAVE, LLP-KCMO
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
(816) 374-3200

*Attorneys for Defendants Ferrellgas
Partners, L.P. and Ferrellgas, L.P.*

Elizabeth A. N. Haas
Kate E. Gehl
FOLEY & LARDNER LLP
777 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
(414) 271-2400

*Attorneys for Defendants AmeriGas
Partners, L.P., AmeriGas Propane, Inc.,
AmeriGas Propane, L.P., and UGI
Corporation*

Brandon J.B. Boulware
Jeremy M. Suhr
GERMAN MAY, PC
1201 Walnut Street, 20th Floor
Kansas City, Missouri 64106
(816) 471-7700

*Attorneys for Defendants AmeriGas
Partners, L.P., AmeriGas Propane, Inc.,
AmeriGas Propane, L.P., and UGI
Corporation*

# TABLE OF CONTENTS

**Page**

I.   Introduction ........................................................................................1

II.  Argument ...........................................................................................4

    A.  A One-Time Agreement To Reduce Fill Level Is Not A
        Continuing Violation ...................................................................4

        1.  *The Continuing Violation Doctrine Requires Plaintiffs To
            Plausibly Allege A Continuing Conspiracy* ............................4

        2.  *Plaintiffs' Complaint Does Not Plausibly Allege A
            Conspiracy That Continued Into The Limitations Period* ..........7

        3.  *Pointing To Sales Within The Limitations Period That
            Were Affected By The Alleged 2008 Agreement Is Not
            Sufficient* .............................................................................13

    B.  Plaintiffs Are At Most Complaining About Continued
        Adherence To The Fill Level Set In 2008, Which As A Matter
        Of Law Does Not Restart The Limitations Period ..........................18

        1.  *Actions That Merely Reaffirm Pre-Limitations Period
            Conduct Do Not Restart The Statute Of Limitations* ...............18

        2.  *Plaintiffs Only Allege That Defendants Adhered To The
            15-Pound Fill Level During The Limitations Period* ..............21

    C.  Plaintiffs' Proposed Rule Contravenes The Core Purposes
        Underlying Congress's Statute of Limitations Without Any
        Corresponding Benefit ....................................................................23

III. Conclusion ........................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Al George, Inc. v. Envirotech, Corp.*,
939 F.2d 1271 (5th Cir. 1991) ............................................................. 6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................... 10, 11, 12

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ......................................................... 5, 16

*Cottier v. City of Martin*,
604 F.3d 553 (8th Cir. 2010) ............................................................. 16

*In re Cotton Yarn Antitrust Litigation*,
505 F.3d 274 (4th Cir. 2007) ............................................................. 15

*Grand Rapids Plastics, Inc. v. Lakian*,
188 F.3d 401 (6th Cir. 1999) ......................................................... 19, 22

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) ......................................................................... 14

*Information Exchange System, Inc. v. First Bank National
Association*,
994 F.2d 478 (8th Cir. 1993) ............................................................. 26

*Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*,
797 F.3d 538 (8th Cir. 2015) ............................................................. 11

*Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*,
677 F.2d 1045 (5th Cir. 1982) ......................................................... 20, 22

*Kaw Valley Electric Cooperative Co v. Kansas Electric Power
Cooperative, Inc.*,
872 F.2d 931 (10th Cir. 1989) ......................................................... 6, 19

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ....................................................................... 13, 14

ii

**Page(s)**

*Lancianese v. Bank of Mount Hope*,
    783 F.2d 467 (4th Cir. 1986) ...........................................................5, 6

*Lehman v. Lucom*,
    727 F.3d 1326 (11th Cir. 2013) ...........................................................19

*Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*,
    824 F.2d 582 (8th Cir. 1987) ...........................................................5, 6

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ...........................................................*passim*

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) ...........................................................15

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ...........................................................15

*Pace Industries, Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ...........................................................19

*Peck v. General Motors Corp.*,
    894 F.2d 844 (6th Cir. 1990) ...........................................................20, 22

*Poller v. Columbia Broadcasting System, Inc.*,
    368 U.S. 464 (1962)...........................................................24

*Rotella v. Wood*,
    528 U.S. 549 (2000)...........................................................23, 24

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)...........................................................22

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) ...........................................................18

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ...........................................................19

iii

*In re Wholesale Grocery Products Antitrust Litigation*,
752 F.3d 728 (8th Cir. 2014) ...............................................................16

*Z Technologies Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) .........................................................6, 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)...................................................................4, 5, 19

## STATUTES

15 U.S.C. § 15b........................................................................................4, 26

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis
of Antitrust Principles and Their Application* (2016)..................................*passim*

Oral Argument, *Morgan-Larson, LLP v. Ferrellgas Partners, L.P.*,
No. 15-2789 (8th Cir. Mar. 16, 2016), http://media-
oa.ca8.uscourts.gov/OAaudio/2016/3/152789.MP3...........................................25

Appellate Case: 15-2789    Page: 6    Date Filed: 02/21/2017 Entry ID: 4503487

# I. INTRODUCTION

The Complaint in this case is based on an alleged conspiracy whereby, *in 2008*, Defendants agreed to reduce the "fill level" of propane tanks to 15 pounds, without simultaneously reducing the prices for those tanks. In 2009—well within the four-year antitrust statute of limitations—a group of plaintiffs brought class action litigation asserting antitrust claims based on the alleged conspiracy. That case eventually settled. Plaintiffs here, however, waited nearly six years to file their suit. That delay was not necessarily fatal, but under settled antitrust principles it required Plaintiffs either to plead a separate new conspiracy within four years of the suit, or a *continuation* of the alleged 2008 conspiracy manifested by overt acts during the four years prior. Mere *effects* within the limitations period would not suffice.

As the panel majority recognized, the Complaint contains no plausible allegations of an ongoing agreement or new coordination within the limitations period. To the contrary, Plaintiffs simply assert the conclusion that since fill level remained at 15 pounds, prices remained collusive. That is not a logical conclusion, since each time tank prices changed over those six years the propane price per pound changed, and nothing dictates that every new price must be collusive. Neither is it a conclusion plausibly inferred from any well-pleaded facts. Indeed, the Complaint alleges that the conspiracy "succeeded" by October 2008 (Compl.

1

¶ 10 (JA0133)), and includes no allegations about what happened to prices during the ensuing six years (*e.g.*, whether they moved in lockstep), nor any plausible allegations of new meetings or communications to continue the 2008 agreement.

Under all relevant precedent, a one-time collusive agreement to lower fill levels—unaccompanied by plausible allegations of continuing coordination—is not a continuing violation. Mere sales of 15-pound tanks within the limitations period do not qualify as illegal, overt acts in support of an earlier conspiracy. Those sales might mean that Plaintiffs incurred additional injury during the limitations period, but it is well-settled that merely feeling the consequences of a prior act does not restart the clock.

Nor is there any rule that all "price-fixing" cases necessarily involve a continuing violation. That makes no sense, as a one-time price-fixing agreement is entirely plausible. Rather, price-fixing cases are continuing violations "when conspirators continue to meet to fine-tune their cartel agreement." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004). It is that sort of "fine-tuning" that meets the legal requirement that there be an overt act within the limitations period. Yet here there are no plausible allegations of "fine-tuning" or any other kind of ongoing coordination—only continuing effects.

Even if this Court could find plausible allegations of overt acts within the limitations period, those acts are, at most, mere reaffirmations of a pre-limitations

2

violation. As this Court and the vast majority of circuits have recognized, that is insufficient to restart the limitations period. Where the alleged conspiracy is to continue doing the same thing that the conspirators have always done, the damages are reasonably ascertainable in advance and a plaintiff can make an informed decision about whether to sue when the claim first accrues. In contrast, where conspirators continue to tweak the parameters of their conspiracy, the damages from that conspiracy are not ascertainable in advance and a plaintiff may lack the information needed to file suit at an earlier date. Only in the latter case (*i.e.*, the "typical" price-fixing case) is the continuing violation doctrine triggered.

This case is a perfect example of why Plaintiffs' categorical, one-size-fits-all "price-fixing" rule does not (and should not) exist. Plaintiffs could have brought their claims six years earlier and sought a full remedy for the same claims they are pursuing today. Other plaintiffs did precisely that. But Plaintiffs sat on their rights instead. They continued to buy (and sell) propane tanks at the prices they now decry as supracompetitive. And, under Plaintiffs' theory, they could have continued to do so for decades more while memories faded and evidence became even more stale. There is no basis in law, policy, or precedent for that approach.

3

## II.    ARGUMENT[1]

Congress provided that private antitrust suits for damages "shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. It is undisputed that Plaintiffs' claim accrued in 2008 when, Plaintiffs allege, Defendants agreed to a one-time reduction in the quantity of propane sold in their filled tanks. Plaintiffs did not bring this suit until 2014, more than four years later. Accordingly, the only question is whether the "continuing violation" doctrine can salvage Plaintiffs' otherwise untimely claims. It cannot.

### A.    A One-Time Agreement To Reduce Fill Level Is Not A Continuing Violation

#### 1.    The Continuing Violation Doctrine Requires Plaintiffs To Plausibly Allege A Continuing Conspiracy

At the most basic level, for there to be a continuing violation there must be an antitrust violation that continues into the limitations period. That the plaintiff suffered injury during the limitations period is alone insufficient. If the defendant did not also commit an overt act in furtherance of the conspiracy during the limitations period, the later consequence of a pre-limitations act will not itself restart the clock.

That is the teaching of *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), where the Supreme Court recognized that, "[i]n the context of a

---

[1]    Defendants set forth the factual background and procedural history of this case in prior briefing. *See* Defendants-Appellees' Panel Br. 2-8.

continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* at 338. As this Court and other courts of appeals have explained, *Zenith* "held that a continuing conspiracy may extend the statutory period on private antitrust actions, because a cause of action arises each time the plaintiff is injured by an overt act of the defendant in furtherance of the unlawful conspiracy." *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 586 (8th Cir. 1987); *see also, e.g.*, *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986) ("*Zenith* applies only where there is an overt act in furtherance of an antitrust conspiracy or a separate substantive violation which is committed within the limitations period.").

Following *Zenith*, this Court and every other court of appeals to have considered the issue have held that simply feeling the "unabated inertial consequences (of a single act) do[es] not restart the statute of limitations." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000) (citation omitted); *see also Midwestern Mach. Co.,* 392 F.3d at 271 (noting the critical "distinction between 'new and independent acts [that] inflict new and accumulating injury on the plaintiff' (which restart the statute of limitations), and unabated inertial consequences of previous acts (which do not)" (citations

5

omitted)); *Lomar Wholesale Grocery, Inc.*, 824 F.2d at 586 ("'[M]erely [feeling] the abatable but unabated inertial consequences of some pre-limitations' conduct" does "not give rise to [a] new cause[] of action." (citation omitted)); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) ("[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." (citation omitted)); *Al George, Inc. v. Envirotech, Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991) ("[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period." (citation omitted)); *Kaw Valley Elec. Coop. Co v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 933 n.5 (10th Cir. 1989) ("[T]he mere receipt of benefits within the limitations period from antitrust violations that occurred outside the limitations period does not give rise to a new cause of action."); *Lancianese*, 783 F.2d at 470 ("It is not sufficient that the plaintiff may have suffered the damages caused by the defendant's violation within the limitations period.").

In short, for a "continuing conspiracy" to amount to a "continuing violation" the violation must actually *continue* into the limitations period—*i.e.*, an overt act in furtherance of the unlawful conspiracy must occur during the limitations period.

6

## 2. *Plaintiffs' Complaint Does Not Plausibly Allege A Conspiracy That Continued Into The Limitations Period*

This well-settled, common-sense rule that a continuing violation lasts only so long as the violation actually continues is fatal to Plaintiffs' case. The Complaint contains no plausible allegations that Defendants' alleged antitrust violations continued into the limitations period. As the panel majority held, "the only specific conspiratorial acts alleged in Plaintiffs' complaint occurred in 2008, outside the limitations period in this action. Although Plaintiffs assert that Defendants' conspiracy is a continuing conspiracy, Plaintiffs only claim that Defendants continue to maintain the same fill levels and never specifically allege in their complaint that Defendants continue to conspire about prices." Op. 10.

Specifically, the Complaint alleges that, in 2008, faced with rising materials prices and customers unwilling to pay more for filled propane tanks, Defendants conspired to move the industry standard from a 17-pound fill level to a 15-pound fill level. Compl. ¶¶ 6-7 (JA0132-33). On Plaintiffs' own account, "[b]y October 2008, the propane conspiracy succeeded." *Id*. ¶ 10 (JA0133). By that point, Plaintiffs allege, the major retailers in the industry had accepted the 15-pound fill level, and it would have been difficult for Defendants to "prepare their facilities to fill both 15-pound and 17-pound" tanks. *Id*. ¶ 88 (JA0150).[2] Once that alleged

---

[2]  Plaintiffs now claim that "Defendants made this reduction without having to make any structural or technological changes to their manufacturing process."

7

conspiracy "succeeded," remaining at the new industry fill standard was merely an "inertial consequence."

Plaintiffs allege in general terms that, having "succeeded" in their conspiracy to move the industry to a 15-pound fill level, Defendants nonetheless "continued to have discussions regarding pricing for contracts at least through 2010 which constituted new and independent acts in furtherance of Defendants' agreement not to compete." Compl. ¶ 13 (JA0134). But those allegations are wholly conclusory. Plaintiffs fail to describe the terms on which this "agreement not to compete" was reached; fail to allege who at each company carried on these supposed conspiratorial conversations during the limitations period; and fail to allege specifically where or when these discussions took place. *See, e.g.*, *id.* (alleging that "AmeriGas and Blue Rhino continued to have discussions regarding pricing for contracts at least through 2010" without identifying any individuals at Blue Rhino, when or where in 2010 these discussions occurred, or what (if any) agreement was reached); *id.* ¶ 60 (JA0145) (referring to unidentified "employees of Blue Rhino" and alleging only "conversations" about fill quantity, not price); *id.*

Plaintiffs-Appellants' Supplemental Brief ("Br.") 5. Nothing in the Complaint supports that assertion; to the contrary, the Complaint alleges that it *would* be difficult to produce both 15-pound and 17-pound tanks. Compl. ¶ 88 (JA0150); *see also* FTC Complaint ¶ 42, *In the Matter of AmeriGas and Blue Rhino*, FTC Docket No. 9360 (Mar. 27, 2014), 2014 WL 1396496 (alleging that Defendants anticipated "it would be very challenging to produce two different size products long-term" (citation omitted)).

8

¶¶ 92-93 (JA0151) (alleging that, "[t]hrough at least the end of 2010, Defendants regularly communicated to assure compliance with the conspiracy" without identifying any individuals at either company, where those communications took place, or what assurances were provided, and providing only an example of a conversation in 2008); *id.* ¶¶ 109, 125 (JA0154, JA0158) (alleging that "Defendants continued to have regular communications regarding pricing, fill levels, and market allocation until at least late 2010" without providing any details).[3] Likewise, Plaintiffs' allegations of market and customer allocation are conclusory, contradictory, and implausible. For example, Plaintiffs allege that "AmeriGas took Walmart's West Coast business and Blue Rhino took Wal-Mart's East Coast business," *id.* ¶ 91 (JA0150-51), at the same time they allege that *Walmart* intentionally "split[s] its business among multiple suppliers to foster competition," *id.* ¶ 54 (JA0143).

---

[3] A few paragraphs do identify an AmeriGas employee by name, but they do not identify any Blue Rhino employee who supposedly had these conspiratorial conversations within the limitations period, and their allegations concern discussions about fill levels, not prices. *See, e.g.*, Compl. ¶¶ 60, 62 (JA0145-46). The only allegation involving that AmeriGas employee that even touches on any agreement regarding price says that, in talking to other *AmeriGas* executives, "Janish repeatedly dismissed concerns that Blue Rhino might undercut AmeriGas on price *or* fill levels with words to the effect that: 'I talked to Blue Rhino, and that's not going to happen.'" *Id.* ¶ 62 (JA0145-46) (emphasis added). There are no allegations about whether that purported conversation occurred during the limitations period, to whom at Blue Rhino "Janish" supposedly spoke, whether the assurance concerned fill level or price or both, or any other details.

Appellate Case: 15-2789     Page: 15     Date Filed: 02/21/2017 Entry ID: 4503487

Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007), conspiracy allegations without any "factual enhancement" do not cross "the line between possibility and plausibility." And Plaintiffs' argument is not factual at all; it is theoretical. They ask this Court to infer a continued conspiracy based on (a) the entirely conclusory allegation that prices during the limitations period were "supracompetitive," *see* Compl. ¶¶ 13, 121 (JA0134, JA0157),[4] and (b) a principle ascribed to the Areeda treatise that "if a cartel in a competitively structured market caused overnight increases in short-term prices, one would expect prices to move back . . . very quickly after cartel enforcement ceased," such that it is "reasonable to infer continuing acts from continuing higher prices." Br. 9 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 320c2 (2016) ("Areeda")).

The Areeda treatise, however, does *not* stand for the proposition that "continuing high prices alone" are invariably sufficient to infer that a price-fixing conspiracy is ongoing. At best it argues that continuing high prices may be sufficient to toll the limitations period when "subsequent enforcement" appears necessary to maintain those prices. *See* Areeda § 320c2 ("[T]he outcome could vary with the facts."). Areeda notes that where an agreement is "structural," it

---

[4]  Beyond the "supracompetitive" label, Plaintiffs offer no facts about the actual prices of propane tanks, no facts about what "competitive" prices would have been, and no facts showing that the two diverged after 2008.

Appellate Case: 15-2789     Page: 16     Date Filed: 02/21/2017 Entry ID: 4503487

"may have longer-lasting price effects, making subsequent enforcement unnecessary." *Id.* In those cases, higher prices alone are *not* evidence of an ongoing agreement. *Id.*

Here, the Complaint alleges a one-time structural change in fill levels. It also explicitly acknowledges that changes in material costs constantly affect propane tank prices. *See* Compl. ¶ 50 (JA0142) ("Defendants faced rapidly increasing input costs, including increases in the cost of propane, steel for the tanks, and the diesel fuel for the delivery trucks."). And there are innumerable occasions on which Defendants and non-colluding propane suppliers set prices for 15-pound tanks. Therefore, on the well-pleaded facts, there is every reason to wonder how the 2008 fill-level changes affected prices—set through individually negotiated contracts with retailers—years later.

The answer is nowhere to be found in the Complaint. Plaintiffs instead assert, as an article of faith, that because "a conspiracy cannot continue merely on its own inertia," there *must* have been "regular monitoring, mutual reassurances, and the threat of retaliation" keeping this one going. Br. 21-22. *Zenith* and *Twombly* would be meaningless if that tactic worked, frustrating the Supreme Court's instructions that a plaintiff should not be able to press forward just by offering a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797

11

F.3d 538, 543 (8th Cir. 2015) (emphasizing the importance of "weeding out meritless antitrust claims at the pleading stage" in light of "the unusually high cost of discovery in antitrust cases" (citations omitted)).  The overt acts that kept the conspiracy going during the limitations period must be alleged; without such allegations, the only plausible inference is that the conspiracy did not, in fact, continue.

Ultimately, the allegations as to post-2008 conduct here are even less plausible than those found insufficient in *Twombly*.  There, the plaintiffs alleged specific "parallel conduct" along with a "conclusory allegation of agreement."  550 U.S. at 556-57.  Here, as to any post-2008 "price-fixing conspiracy," Plaintiffs offer *only* the conclusory allegation of discussions by unnamed employees.  They allege no parallel pricing, no refusal to continue retailer-by-retailer negotiations on price, and no other indicators of price collusion that would raise their post-2008 "price-fixing" allegations to the level of plausibility required by *Twombly*.  And because the statute of limitations had already run on a claim based on any 2008 agreement, Plaintiffs' failure to raise plausible allegations about post-2008 antitrust violations means their Complaint must be dismissed as time-barred.[5]

---

[5]  Notably, while Plaintiffs purport to rely on the FTC's separate complaint against Defendants (*see, e.g.*, Compl. ¶¶ 94-99 (JA0151-52)), Plaintiffs' account departs sharply from the FTC's—even as to pre-limitations period conduct. Specifically, the FTC did not believe that Defendants' move to a 15-pound fill

Appellate Case: 15-2789    Page: 18    Date Filed: 02/21/2017 Entry ID: 4503487

Plaintiffs do not really dispute that, in general, they must identify an antitrust violation that has continued into the limitations period in order to establish a continuing violation. *See* Part I.A.1, *supra*. Instead, they attach talismanic significance to their allegation of a "price-fixing conspiracy" and argue that price-fixing conspiracies are categorically different for limitations purposes than every other antitrust violation. *See, e.g.*, Br. 17. As to price-fixing cases, they say, the Supreme Court established an unequivocal rule in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), that any sale within the limitations period restarts the clock. Anytime a "price-fixing conspiracy" is alleged, the argument goes, the claim is timely if the plaintiff purchased the defendant's product within the prior four years.

*Klehr* announces no such categorical exception. Indeed, *Klehr* established no rule at all about what constitutes an overt act in antitrust cases. The Supreme

---

level was collusive, nor did it believe that Defendants colluded on prices; the FTC challenged only Defendants' coordinated efforts to obtain Wal-Mart's consent to the change in fill amount. *See* Statement of Chairwoman Edith Ramirez and Commissioner Julie Brill at 1, *In the Matter of AmeriGas and Blue Rhino,* FTC Docket No. 9360 (Oct. 31, 2014), 2014 WL 5787605 ("The Commission's Complaint does not allege that [Defendants'] initial decisions to reduce fill levels to 15 pounds were the result of an agreement."); Dissenting Statement of Commissioner Maureen K. Ohlhausen at 1-2, 2014 WL 5787605 ("[T]he complaint in this matter did not allege an agreement between [Defendants] to keep their respective prices to Walmart constant. There was no allegation in the complaint that the parties agreed in any way on the pricing of the lesser-filled propane tanks.").

Court's focus there was instead on the "last predicate act" rule that would have allowed a RICO plaintiff to recover *pre-limitations* damages. In the course of rejecting that rule, the Court wrote that

> in the case of a "continuing violation," say a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g.*, each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.*

521 U.S. at 189 (emphasis added) (citations omitted).

As Defendants explained in detail in prior briefing (*see* Defendants-Appellees' Panel Br. 18-20; Defendants-Appellees' Resp. to Pet. for Reh'g 4-10), the italicized sentence was the critical point for purposes of deciding that case, and *Klehr*'s discussion of price fixing was pure dictum.[6] More fundamentally, even that dictum is silent about the facts presented here, where the alleged conspiracy "succeeded" outside the limitations period (Compl. ¶ 10 (JA0133-34)), and

---

[6] Indeed, *Klehr*'s statement was not even well-considered dictum meriting this Court's deference. *See* Defendants-Appellees' Resp. to Petition for Reh'g 5-7. The parties there submitted no briefing on the (irrelevant) question of what constitutes an overt act in a price-fixing conspiracy, and none of the cases the Court cited in support of its statement about price fixing even *involved* a price-fixing conspiracy. Even the passage the Court quoted from the 1995 version of the Areeda treatise concerned *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), which involved not price fixing but rather a refusal to sell machinery.

14

Defendants simply continue to make sales of the product without any ongoing agreement about price. *Klehr*'s reference to a "continuing violation" is far better understood as referring to the "typical antitrust continuing violation," where the agreement remains in effect into the limitations period, rather than ending after a successful one-time change. *Midwestern Mach. Co.*, 392 F.3d at 269. Indeed, all of the cases that Plaintiffs say have treated "*Klehr*'s language [as] binding," Br. 12, fit this "typical" mold. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086-87 (9th Cir. 2014) (price-fixing claims based on standard-setting agreement with royalty provision that remained in effect through the limitations period); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 829 (11th Cir. 1999) (holding that "these actions are time-barred" if "the jury finds that this conspiracy did not continue into the four-year limitations period").[7]

---

[7] Plaintiffs also point to *In re Cotton Yarn Antitrust Litigation*, 505 F.3d 274 (4th Cir. 2007). Br. 12-13. The court there was not actually deciding the limitations question, but rather whether an arbitration clause shortening the limitations period to one year was enforceable. In any event, the complaint there alleged an active conspiracy stretching into the limitations period, too. *See* Consolidated and Amended Class Action Complaint ¶¶ 41, 42(a)-(b)*, In re Cotton Yarn Antitrust Litigation*, Case No. 1:04MD1622 (M.D.N.C. Jan. 7, 2005) (alleging the defendants "engaged in a continuing contract, combination or conspiracy" via "meetings, communications and/or conversations" in which they "agreed . . . to charge prices at specified levels").

15

*In re Wholesale Grocery Products Antitrust Litigation*, 752 F.3d 728 (8th Cir. 2014), on which Plaintiffs also rely (Br. 17), is no different.[8] This Court did not announce a categorical "price-fixing" exemption from the established rule that the "unabated inertial consequences (of a single act) do not restart the statute of limitations." *Concord Boat Corp.*, 207 F.3d at 1052. The claims there were based on a non-compete agreement that remained in effect and produced steadily increasing prices during the limitations period. *See Wholesale Grocery*, 752 F.3d at 736 ("Under *Klehr*, a monopolist commits an overt act each time he uses unlawfully acquired market power to charge an elevated price."). The limitations issue centered on the fact that "the anticompetitive nature of the wholesalers' agreement was not revealed until several years after the asset exchange." *Id.* at 736. Because "[t]he limitations period begins to run against customers only when the 'customers *have reason to know* of the violation,'" *id.* at 737 (citation omitted), this Court concluded that the claims were timely.[9]

But the fact that many price-fixing agreements involve ongoing coordination does not mean that *every* price-fixing agreement involves ongoing coordination.

---

[8]  Plaintiffs are of course wrong when they suggest that *Wholesale Grocery* "binds this case." Br. 17. To the extent that decision could be read to deviate from this Court's other cases, it does not bind the *en banc* Court. *See Cottier v. City of Martin*, 604 F.3d 553, 556 (8th Cir. 2010) (en banc).

[9]  Plaintiffs' argument that the *district court* thought the violations were apparent earlier (Br. 16) is irrelevant in light of this Court's treatment of the issue. *See* 752 F.3d at 736.

16

As Plaintiffs themselves acknowledge, "Professor Areeda's definitive treatise . . . explain[s] that the existence of a continuing violation 'depends heavily *on the particular facts* as well as the type of violation'" alleged. Br. 2 (emphasis added) (citation omitted). Where, as here, the only plausible allegations describe a single, one-time price increase effectuated by a quantity reduction, a plaintiff cannot gain the benefit of the continuing violation theory just by arguing that *other* types of price-fixing conspiracies constitute continuing violations. Merely attaching a "price-fixing" label cannot transform a one-time agreement into a continuing violation.

Instead, the more analogous cases are others involving one-time acts with ongoing effects on price. In the context of a merger, for example, "[e]ven if the merger itself was unlawful, the continued existence of the merged entity is not a continuing violation: It is simply the natural unabated inertial consequence of the merger." *Midwestern Mach. Co.*, 392 F.3d at 271. Similarly, in the context of unlawful monopolizations, "[t]he courts consistently hold that if the monopoly is created by a single identifiable act and is not perpetuated by an ongoing policy, the statute of limitation runs from the time of commission of that act, notwithstanding that high prices may last indefinitely into the future." Areeda ¶ 320c4. And in the context of unlawful tying, the fact that a customer remained obligated to purchase products in tandem during the limitations period was no basis for allowing a

17

challenge to the pre-limitations period agreement that had created that obligation. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1019-20 (8th Cir. 2004).

Because Plaintiffs do not (and cannot) plausibly allege an *ongoing* agreement to fix prices, Defendants' sales within the limitations period are not part of a "continuing violation" of the sort *Klehr* envisioned and *Wholesale Grocery* confronted. At most, the sales Plaintiffs have alleged within the limitations period were affected by pre-limitations conduct, but that provides no basis to restart the clock to challenge the earlier conduct. This Court need go no further to resolve this case.

## B. Plaintiffs Are At Most Complaining About Continued Adherence To The Fill Level Set In 2008, Which As A Matter Of Law Does Not Restart The Limitations Period

If this Court disagrees with the panel majority's reading of the Complaint, and finds plausible allegations of overt acts within the limitations period, it should still affirm. Even then, Defendants merely "reaffirmed" pre-limitations conduct, which is insufficient to restart the limitations period.

### 1. *Actions That Merely Reaffirm Pre-Limitations Period Conduct Do Not Restart The Statute Of Limitations*

Not all overt acts restart the statute of limitations. In *Varner*, this Court recognized that the overt act relied upon must have "two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act, and (2) it must inflict new and accumulating injury on the plaintiff." 371 F.3d at 1019.

18

The vast majority of other courts of appeals to address the question have adopted the same rule. *See, e.g.*, *Kaw Valley Elec. Coop. Co.*, 872 F.2d at 933 ("[T]wo elements characterize an overt act which will restart the statute of limitations: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (same); *cf. Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir. 2013) (adopting rule in civil RICO context).[10]

This two-part test is firmly rooted in the Supreme Court's teachings about the accrual of antitrust claims. *Zenith* held that because accrual of an antitrust claim is tied to the illegal act, rather than to when damages are felt, a claim accrues as soon as the act occurs and the plaintiff feels *any* ill effect from it. *See* 401 U.S. at 339 ("[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date *and all provable damages that will flow in the future from the acts of the conspirators on that date*." (emphasis added)). *Varner*'s two-

---

[10] The Third Circuit appears to hold that mere reaffirmations could restart the limitations period. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 107 (3d Cir. 2010). To the extent that rule applies even where the reaffirmation does not change the predictable damages caused by pre-limitations period conduct, the Third Circuit's approach is inconsistent with *Zenith*. *See infra* at 19-20.

Appellate Case: 15-2789   Page: 25   Date Filed: 02/21/2017 Entry ID: 4503487

part test gives force to this principle in the context of a continuing violation by recognizing that where an overt act is not "new and independent" of an earlier act, or does not create "new and accumulating injury," then any claim for damages that could be based on the overt act will have already accrued. *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051-52 (5th Cir. 1982) (noting the "relationship between the continuing violation exception . . . and the speculative damages exception in *Zenith*").

Numerous cases therefore ask whether the ostensibly new conduct within the limitations period is merely an "unabated inertial consequence" of a pre-limitations act or, instead, sufficiently different that it would "inflict new and accumulating injury on the plaintiff." Under these cases, the defendants' mere receipt of continuing benefits from a pre-limitations act does not restart the limitations period, as those are classic "unabated inertial consequences." Rather, the plaintiff must show "new and independent" acts that "inflict new and accumulating injury on the plaintiff," and cannot pursue damages based on claims that had accrued before the limitations period. *See, e.g.*, *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 848-49 (6th Cir. 1990) (rejecting argument that plaintiffs could pursue price-fixing claims simply "because they felt the adverse impact of GMC and GMAC's conspiracy as recently as 1988" and holding that "the fact that the Pecks' injuries have a rippling effect into the future only establishes that they might have been

20

entitled to future damages if they had brought suit within four years of the commission of the last antitrust violation").

2. *Plaintiffs Only Allege That Defendants Adhered To The 15-Pound Fill Level During The Limitations Period*

Even if the bare-bones post-2008 allegations in the Complaint could pass *Twombly*'s plausibility threshold, they still would not save Plaintiffs' claim under *Varner*'s two-part test. That is because Plaintiffs have not alleged, under *any* reading of the Complaint, that Defendants engaged in overt acts during the limitations period that were anything other than "reaffirmations" of the earlier fill-level agreement.

Plaintiffs' failure to allege any modifications to the supposed agreement during the limitations period distinguishes this case from the classic price-fixing case in which "conspirators continue to meet to fine-tune their cartel agreement." *Midwestern Mach. Co.*, 392 F.3d at 269-70. Plaintiffs are complaining that propane tanks are still filled to 15 pounds, inherently affecting the propane price per pound. The problem is that, on Plaintiffs' account, complete relief would have been available had Plaintiffs filed suit within four years of the alleged agreement; had Plaintiffs pressed forward with their claims as part of the 2009 class action, they could have sought relief for both the past *and future* effects of the alleged agreement. *See, e.g.*, *Grand Rapids Plastics, Inc.*, 188 F.3d at 406-07 (noting that "a plaintiff's own projections and experience during its years of operation are

21

sufficient to provide a reasonable basis for calculating [future] damages"); *cf. Peck*, 894 F.2d at 848-49.

Plaintiffs' argument that it is just as illegal to *maintain* a price by agreement as it is to *modify* a price by agreement (Br. 16) is thus beside the point. The relevant question is not whether the conduct alleged is legal, but whether it could have been timely challenged. Because a cause of action for past and future damages accrues on the first date of injury, at which time the plaintiff is the beneficiary of a generous proof of damages standard, *see Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931), mere reaffirmation of an agreement to maintain prices cannot extend the limitations period.

In contrast, if the conspiracy is dynamic, requiring fine-tuning or outright modifications over time, then it may not be reasonable to require plaintiffs to file suit early. Here, hypothetically, had Defendants agreed to newly adjusted prices in 2014, it would not be reasonable to say that plaintiffs should have sued for that injury in 2012. But there is nothing like that in this Complaint. At most, Defendants are supposedly "maintaining" the alleged agreement by filling tanks to 15 pounds and receiving "continuing benefits" from that. *See Kaiser Aluminum*, 677 F.2d at 1051-52 (noting that the "continuing benefits exception," under which "receipt of benefits under the contract is a continuing violation of the antitrust

22

laws," does not apply where "antitrust damages were ascertainable at the time of the original antitrust violation").

Because Plaintiffs have not alleged that Defendants altered their conspiracy at any time during the limitations period, any claim for damages from that conspiracy was as reasonably ascertainable within the four-year limitations period as they are today. Thus, even if Plaintiffs' post-2008 allegations were plausible, this Court should still affirm the district court.

### C. Plaintiffs' Proposed Rule Contravenes The Core Purposes Underlying Congress's Statute of Limitations Without Any Corresponding Benefit

Plaintiffs' proposed rule would destroy the very purposes served by the congressionally enacted four-year statute of limitations without any corresponding benefit.

A primary reason to allow wholesale customers like Plaintiffs to bring damages suits without needing to account for the fact that they have passed elevated costs along to their own retail customers is the hope that they will act as "private attorneys general" to advance broader consumer interests. *Rotella v. Wood*, 528 U.S. 549, 557 (2000); *see also id.* (describing the "congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize" antitrust violations). Congress did not intend retailers knowingly to pass along supracompetitive prices to consumers for years, then later recover

23

damages by arguing that those same prices were unlawful and should never have been charged. As the Supreme Court explained in the RICO context in *Rotella*, the "expected benefit of suppressing [illegal] activity" is "an object pursued the sooner the better," making it "strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize." *Id.* at 558. It is "because we want to encourage plaintiffs not to sit on their rights" that "the statute of limitations is not extended under the continuing violations doctrine if the plaintiff had actual knowledge of the initial violation and suffered an injury." *Z Techs. Corp.*, 753 F.3d at 603; *see also Midwest Mach. Co.*, 392 F.3d at 272 ("[I]nitial violations of the Sherman Act usually occur in secret [but] where the plaintiff had actual knowledge of the initial violation and suffered sufficient injury, courts generally do not toll the statute of limitations based on a continuing violation theory."); Areeda § 320a (noting that Congress's reasons for insisting that claims be brought promptly are "particularly strong in the case of 'public' acts challenged as antitrust violations" in which "injured parties are able to feel and perhaps to assess their injuries almost immediately").

Along with its benefits for the public at large, a robust statute of limitations is also important for providing repose and protecting defendants from baseless charges. In antitrust, "where motive and intent play leading roles," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962), cases often turn on whether

24

a jury believes the innocent explanations a defendant offers for parallel conduct that would only be illegal if carried out under a joint agreement. Where suits are brought years (if not decades) after the fact, a defendant may lack the evidence necessary to show that facially suspicious parallel activities were in fact lawful responses to "surrounding circumstances, including the behavior of rival firms and general market conditions—matters that may be hard to reconstruct long afterwards." Areeda § 320a. That concern would be particularly pronounced under Plaintiffs' proposed rule, which Plaintiffs have candidly acknowledged would allow a plaintiff to bring suit alleging that an agreement was reached *a century* earlier so long as the plaintiff had purchased an affected product within the limitations period. *See* Oral Argument at 4:55-5:49, *Morgan-Larson, LLP v. Ferrellgas Partners, L.P.*, No. 15-2789 (8th Cir. Mar. 16, 2016), http://media-oa.ca8.uscourts.gov/OAaudio/2016/3/152789.MP3. That a plaintiff would only be able to recover damages for the four years prior is cold comfort when the heart of the case centers on events that occurred many years or even decades in the past.

Plaintiffs suggest that "defendants have no legitimate interest in repose in the context of price-fixing conspiracies, as such conspiracies are *never* lawful." Br. 20. But statutes of limitations are always, by definition, offered as a defense by someone accused of doing something unlawful. Holding that they should be given

25

Appellate Case: 15-2789    Page: 31    Date Filed: 02/21/2017 Entry ID: 4503487

less force when a plaintiff accuses a defendant of something that is "never lawful" is an exception that would quickly swallow the rule.

To the extent Plaintiffs are (again) seeking to create special rules for alleged "price-fixing conspiracies," Congress enacted a single statute of limitations that is equally applicable to all antitrust violations. *See* 15 U.S.C. § 15b. And the purpose served by that limitations period is the same regardless of the type of violation alleged: "to put old liabilities to rest, to relieve courts and parties from 'stale' claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring their claims promptly, particularly when they are known or can be determined." Areeda § 320a. Each of those purposes is served only by enforcing the limitations period as written to Plaintiffs' claims.[11]

---

[11] Where a defendant hides its violations, other doctrines such as fraudulent concealment provide distinct bases for tolling the limitations period. *See Info. Exch. Sys., Inc. v. First Bank Nat'l Ass'n*, 994 F.2d 478, 484 (8th Cir. 1993). There is no need to expand and distort the continuing violation doctrine to protect unknowing plaintiffs from secret conspiracies. And, of course, there was nothing secret about the conspiracy alleged here.

26

## III. CONCLUSION

For all the foregoing reasons, this Court should affirm the judgment of the district court.

Dated: February 17, 2017

Respectfully Submitted,

s/ Niall E. Lynch

Dan M. Wall
Niall E. Lynch
Jesse B. McKeithen
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
(415) 391-0600

Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, DC 20004
(202) 637-2200

*Attorneys for Defendants*
*Ferrellgas Partners, L.P.*
*and Ferrellgas, L.P.*

Craig S. O'Dear
Catesby A. Major
Tracy R. Hancock
BRYAN CAVE, LLP-KCMO
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
(816) 374-3200

*Attorneys for Defendants*
*Ferrellgas Partners, L.P.*
*and Ferrellgas, L.P.*

27

Dated:  February 17, 2017

Respectfully Submitted,

s/ Jay N. Varon

Jay N. Varon
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
(202) 672-5380

Elizabeth A. N. Haas
Kate E. Gehl
FOLEY & LARDNER LLP
777 E. Wisconsin Avenue
Milwaukee, Wisconsin  53202
(414) 271-2400

Brandon J.B. Boulware
Jeremy M. Suhr
GERMAN MAY, PC
1201 Walnut Street, 20th Floor
Kansas City, Missouri  64106
(816) 471-7700

*Attorneys for Defendants AmeriGas Partners, L.P., AmeriGas Propane, Inc., AmeriGas Propane, L.P., and UGI Corporation*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND EIGHTH CIRCUIT RULE 28A

1.     This brief complies with the type-volume limitation of this Court's Order of January 19, 2017 because the brief contains 6,421 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

3.     Pursuant to Eighth Circuit Rule 28A(h), a virus check of this brief was performed using System Center Endpoint Protection and according to that program no virus was detected.

Dated: February 17, 2017                    s/ Niall E. Lynch
                                            Niall E. Lynch

                                            *Attorney for Defendants*
                                            *Ferrellgas Partners, L.P. and*
                                            *Ferrellgas, L.P.*

Appellate Case: 15-2789     Page: 35     Date Filed: 02/21/2017 Entry ID: 4503487

## CERTIFICATE OF SERVICE

The undersigned herby certifies that on February 17, 2017, a copy of the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.


Dated: February 17, 2017     s/ Niall E. Lynch
                 Niall E. Lynch

                 *Attorney for Defendants*
                 *Ferrellgas Partners, L.P. and*
                 *Ferrellgas, L.P.*

Appellate Case: 15-2789  Page: 36  Date Filed: 02/21/2017 Entry ID: 4503487